# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Aaron Eason,

      Plaintiff,

  v.

Walgreen Co.,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-3184 ADM/SER

_____

Daniel G. Leland, Esq., Baillon, Thome, Jozwiak & Wanta LLP, Minneapolis, MN, on behalf of Plaintiff.

Dominic J. Cecere, Esq., Stinson Leonard Street LLP, Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On April 23, 2015, the undersigned United States District Judge heard oral argument on Defendant Walgreen Co.'s ("Walgreens") Motion for Summary Judgment [Docket No. 37]. Plaintiff Aaron Eason ("Eason") asserts claims for violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54, the Americans with Disabilitis Act ("ADA"), 42 U.S.C. §§ 1201-1213, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-.41. For the reasons set forth below, Walgreens' motion is granted.

## II. BACKGROUND[1]

Eason began his employment with Walgreens in November 2010 as the Inbound/Outbound Operations Manager at its Distribution Center in Rogers, Minnesota. Compl.

---

[1] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

[Docket No. 1-1] ¶ 8.  Eason's duties included overseeing the flow of goods to and from the

Distribution Center and supervising four employees.  Conway Aff. [Docket No. 40] Ex. A

("Eason Dep.") 10:14–20.  His hours overlapped with the Distribution Center's first and second

shift operations so that he could supervise employees working on both shifts.  Id. 13:3–10.

Eason's position was created to provide support for his immediate supervisor, Ralph Walser

("Walser"), the Manager of Operations at the Rogers facility.  Id. 12:19–23.  Walser reported to

Robert Varno ("Varno"), the Director of Operations for the distribution centers in Rogers and

Windsor, Wisconsin.  Leland Decl. [Docket No. 46] Ex. 10 ("Walser Dep.") 18:13–18.

## A.  Eason's 2011 Employment

In 2011, Eason began having attendance issues, missing 20 days of work.  Leland Decl.

Ex. 2.  Walser understood that some of Eason's absences were due to anxiety and stress

stemming from a marital separation and related financial concerns.  Walser Dep. 56:3–15.

Walser met with Eason in February 2011 to discuss his attendance.  Eason Dep. 84:23–85:1.

Walser, feeling that Eason's issues were temporary, did not pursue any disciplinary action.

Despite the attendance issues, Eason earned high marks on his annual review which was

submitted on August 24, 2011.  Leland Decl. Ex. 3; Eason Dep. 151:16–19.

## B.  Eason's 2012 Employment

Eason's attendance issues continued into 2012.  In January alone, he had nine attendance-

related issues.  See generally Eason Dep.  Eason initiated a meeting with Walser on February 3,

2012 to discuss his attendance.  Conway Aff. Ex. K.  At this meeting, Eason disclosed that he

had long-term mental health issues relating to anxiety and depression.  Id.  Upon learning

Eason's mental health problems were not situational, Walser encouraged Eason to apply for

FMLA leave.  Id.

Eason's FMLA paperwork was submitted on February 28, 2012.  Dr. Sarpal, Eason's

physician, wrote that his condition would cause "episodic flare-ups periodically preventing

[Eason] from performing [his] job functions."  Second Leland Decl.[Docket No. 47] Ex. 7.  On

May 9, 2012, Eason attempted to take his first FMLA absence.[2]  Walser Dep. 93:9–13.  The

following day, Eason emailed several Walgreens employees (including those he supervised),

informing them of his FMLA leave and that he had a medical condition which necessitated

periodic absences without advanced warning.  Leland Decl. Ex. 11.  Eason forwarded the email

to Walser and Rebecca Santowski ("Santowski"), a Walgreens Human Resource Manager.  At

this point, Eason's supervisors determined that his future sick days would be unpaid.  Id. Ex. 14.

The error with Eason's FMLA paperwork was also corrected and he was approved for

intermittent leave from May 16 to November 16, 2012.  Id. Ex. 17.

By July 23, 2012, Eason had already accumulated about 11 partial-day absences and 10

full-day absences for the calendar year.  Eason had also taken FMLA approved absences on July

10, 16, 17, and 18.  Id. Ex. 18.

**C.  Eason's Suspension and Termination**

On the morning of July 23, 2012 Eason emailed Walser and others, stating that he was

taking his dog to the vet because she was ill.  Conway Aff. Ex. O.  Later that morning, Eason

emailed Walser:

I just got back from the vet and they could not figure out what is wrong with her.

---

[2] It was discovered following Eason's attempted use of a FMLA absence on May 9, 2012, that his paperwork was not initially approved because it did not indicate the frequency of his "flare-ups" or the period the request covered.  Updated documents were submitted on May 22. On May 30, Eason was notified of his approval.

They suggested someone stay with her and keep an eye on her, but I do not have anyone that can do that (my girls are in Missouri with my parents still). Would it be possible to make this day up by working the equivalent hours over the weekend - I can't afford to miss another day.

Id. Ex. P.  Walser responded to Eason's email that afternoon:

Just catching up on emails. I've been out on the floor.  Sorry to hear about problems with the pooch.  I can't offer you the "make-up" option.  We just have too many irons in the fire that require you to have personal interaction with the team.  Please bring in documentation tomorrow to substantiate today's absence.  Hope your pooch is feeling better.  Talk to you tomorrow.

Id. Ex. Q.

Eason took a FMLA absence the following day, July 24, and returned to work on July 25, 2012.  Leland Decl. Ex. 10.  Eason initiated a meeting with Walser the morning of his return.  Conway Aff. Ex. R.  Eason stated he was not doing well with his depression and anxiety and expressed interest in additional unpaid time off to deal with his mental health issues.  Id.  Walser understood this request as related to both FMLA leave and personal issues.  Id.  Walser responded that he needed to review Eason's current FMLA paperwork before he could address Eason's request for additional leave.  Id.

Walser then shifted the conversation to Eason's July 23, 2012 absence and inquired whether Eason had documentation to substantiate his visit to the vet.  Id.  Eason responded that he spoke only with the receptionist and did not see his vet out of financial concerns.  Id.  Eason became defensive and claimed Walser's request was unfair because he had not previously submitted documentation for absences.  Id.  At the conclusion of the meeting, Walser placed Eason on an indefinite suspension pending review.  Id.

Immediately following the meeting with Walser, Eason stopped by the vet's office seeking documentation for his July 23 visit.  Eason Dep. 115:8–11.  Later that morning, Eason

emailed Walser, stating that the office "will not provide anything since I did not keep the appointment." Conway Aff. Ex. S. Eason wrote to Walser again on July 25 regarding his FMLA leave paperwork. Leland Decl. Ex. 25. Walser responded that day to Eason, copying Director of Operations Varno:

> Your suspension and subsequent review is not based on absences that are covered under FMLA. The request for copies of any documents provided to you by the unpaid leave department, which I originally made on May 16th, is simply to insure that we are both on the same page with regard to your needs under FMLA. My mention of it today is/was in response to your request for options to get more time off of work. My intention is to follow up with you as soon as possible and hope to be able to do that with you by tomorrow or Friday.

Id. Varno responded directly to Walser only with the word: "Nice." Id. Ex. 26.

On July 30, Varno, Walser, and Santowski reviewed Eason's situation. The following day, Walser emailed Eason and requested an explanation for the variation in Eason's story relating to his July 23 absence with his dog. Conway Aff. Ex. T. Varno responded to Walser by writing "Perfect." Leland Decl. Ex. 28. In a detailed reply, Eason alleged there was no variation and that he could not obtain documentation because he "did not make an appointment" as he could not afford the visit to the vet. Id. Ex. 23.

On August 3, 2012 Eason participated in a conference call to review his situation with Walser, Santowski, and Claire Reeve ("Reeve"), a Human Resources Generalist at the Rogers facility. Leland Decl. Ex. 31. In the call, Eason explained he left his dog in the car and spoke with the receptionist about his dog's health because he was concerned about the cost of the visit. Id. Eason elected not to see a vet and followed the receptionist's advice to "keep an eye on her." Id. After speaking with Eason, Walgreens contacted the vet's office. Walser Dep. 198:5–11. Although the office verified Eason's brief visit on July 25 seeking documentation,

they were unable to confirm that Eason had stopped by on July 23, noting that they routinely document the type of visit that Eason alleges occurred on the 23rd.  Conway Aff. Ex. V.

On August 13, 2012, after 20 days on suspension, Eason's employment was terminated. Leland Decl. Ex. 34.  Eason was told that his termination was based on the investigation and conclusion that he was not truthful regarding the circumstances surrounding his July 23, 2012 absence.  Id.  Walser, Varno, Santowski, and Reeve participated in the conversation to terminate Eason.  Leland Decl. Ex. 9 ("Varno Dep.") 44:20–24.  The ultimate decision, however, was Varno's.  Id. 45:1.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."

<u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. <u>Id.</u> However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" <u>Get Away Club, Inc. v. Coleman</u>, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992), (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." <u>Krenik</u>, 47 F.3d at 959.

**B.  FMLA Claims**

The FMLA provides an eligible employee with twelve workweeks of leave during any twelve-month period if they have a "serious health condition" that makes the employee unable to perform the functions of their position. 29 U.S.C. § 2612(a)(1)(D); <u>Spangler v. Fed. Home Loan Bank of Des Moines</u>, 278 F.3d 847, 851 (8th Cir. 2002). The FMLA prohibits interference with any rights protected by the Act and prohibits discrimination of any kind, including discharge, against an employee for asserting rights protected by the Act. 29 U.S.C § 2615(a)(1)-(2); <u>Hite v. Vermeer Mfg. Co.</u>, 446 F.3d 858, 865 (8th Cir. 2006).

The Eighth Circuit recognizes three types of claims arising under the FMLA. <u>Pulczinski v. Trinity Structural Towers, Inc.</u>, 691 F.3d 996, 1005-06 (8th Cir. 2012). The first type is an

"entitlement" claim, "where an employer refuses to authorize leave under the FMLA or takes other actions to avoid responsibilities under the Act." Id. at 1005. The second type is a "retaliation" claim, where an employer takes adverse action against an employee who opposes a practice prohibited by the FMLA. Id. at 1005-06. The third type is a "discrimination" claim, where "an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." Id. at 1006. Here, Eason asserts an entitlement and a discrimination claim.[3]

### 1. FMLA Entitlement

Eason asserts he was suspended because, in part, he requested FMLA leave. While Eason's Complaint stylizes this as an "interference" claim, it is more properly termed as an "entitlement" claim. Johnson v. Bethesda No. 13-2575, 2014 WL 6865484, at *3 (D. Minn. Dec. 3, 2014).

Walgreens asserts that Eason's entitlement claim fails because Eason testified Walgreens never denied him any FMLA leave that he requested. Since a FMLA entitlement claim requires proving an employer refused to authorize FMLA leave or took other action to avoid FMLA responsibilities, Walgreens argues that Eason's claim necessarily fails. Eason responds that he requested FMLA leave during the July 25, 2012 meeting with Walser and he was suspended by the end of the meeting. While Eason does not explain his testimony that he was never denied

---

[3] Eason's Complaint also alleges a FMLA retaliation claim. In a footnote in his brief opposing summary judgment, Eason recognizes his retaliation claim is alleged "only to the extent that some courts have continued to use that title to refer to claims wherein a plaintiff alleges an employer discriminated against an employee for exercising FMLA rights. Pl.'s Mem. Opp'n. Sum. J. [Docket No. 45] 25 n.10. Since Eason does not allege "that he opposed any practice made unlawful under the FMLA," which the Pulczinski Court titled a "retaliation" claim, his retaliation claim, Count III of the Complaint, is dismissed.

any FMLA leave, Eason nevertheless contends the temporal closeness between his FMLA request and his suspension creates a triable issue of fact.

FMLA entitlement claims arise when an employee is denied a benefit to which they are entitled under the statute. Pulczinski, 691 F.3d at 1005. Unlike a FMLA discrimination claim, an employee asserting an entitlement claim does not need to show that the employer acted with discriminatory intent and thus the McDonnell Douglas[4] burden-shifting framework does not apply. Ketchum v. St. Cloud Hosp., 994 F. Supp. 2d 1012, 1019 (D. Minn. 2014). Rather, the employee's "initial burden of proof" is to "show only that . . . she was entitled to the benefit denied." Ballato v. Comcast Corp., 676 F.3d 768, 772 (8th Cir. 2012). However, if the employee meets their initial burden, the employer is not necessarily liable; the FMLA is not a strict-liability statute. Id. Instead, "the burden shifts to the employer to prove there was a reason unrelated to the employee's exercise of FMLA rights for terminating the employee." Id.

Since it is undisputed that Eason was an eligible employee, to prevail on his entitlement claim, Eason must establish that he gave notice to Walgreens of his need for FMLA leave. Wages v. Stuart Mgmt. Corp., 21 F. Supp. 3d 985, 989 (D. Minn. 2014). If Eason satisfies his burden, to avoid liability, Walgreens must prove it would have suspended Eason even if he did not make the FMLA request. Ketchum, 994 F. Supp. 2d at 1019–20.

In Ketchum, an employee was terminated 8 weeks into her 12 week FMLA leave. While the plaintiff argued this, in and of itself, established her claim, the court disagreed, finding "there exists an obvious explanation for her termination short of 12 weeks: the intervening events of May 11, 2012, and the threats (including the "kill list). . . . The fact that these events and threats

_____

[4] 411 U.S. 792 (1973).

were wholly disconnected from her leave scuttles her FMLA claim.  Id. at 1020.  In making this

determination, it was irrelevant whether the plaintiff actually engaged in the alleged conduct.  Id.

The relevant inquiry was whether the employer "had a good faith belief" the plaintiff engaged in

the conduct alleged.  Id. (emphasis in original).

Walgreens has sufficiently established that Eason's suspension was unrelated to his

exercise of his FMLA rights.  When Eason failed to present documentation of his visit to the vet

in their July 25, 2012 meeting, Walser continued to investigate Eason's claim.  Walser provided

Eason multiple opportunities to clarify what happened, eventually contacting the vet's office to

see if they had any record of Eason visiting on July 23, which they did not.  As in Ketchum, the

FMLA approval status of the plaintiff does not undermine the conclusion that Walgreens had a

good faith belief that Eason was being dishonest about his trip to the vet.  With Walgreens' good

faith belief that Eason was dishonest, "there was a reason unrelated to [Eason's] exercise of

FMLA rights for [suspending]" his employment.  Ballato, 676 F.3d at 772.  Thus, Eason's

FMLA entitlement claim fails.

### 2. FMLA Discrimination

Eason argues that his employment with Walgreens was terminated because he exercised

his statutory rights provided by the FMLA.  Walgreens argues that Eason's employment was

terminated not because he exercised his FMLA rights, but rather because he was dishonest about

missing work on July 23, 2012.

Absent direct evidence of discrimination, FMLA discrimination claims are analyzed

under the McDonnell Douglas burden-shifting framework.  Pulczinski, 691 F.3d at 1007.  The

burden first rests on the employee to make a prima facie case of discrimination.  This is

accomplished by showing the employee engaged in activity protected by the FMLA, the

employee suffered an adverse employment action, and that there is a causal connection between

the protected activity and the adverse employment action.  Id.  If the employee can carry this

burden, under McDonnell Douglas, to avoid liability, the employer must articulate a non-

discriminatory justification for the adverse employment action.  Wierman v. Casey's Gen.

Stores, 638 F.3d 984, 999 (8th Cir. 2011).  If the employer offers such a reason, the burden shifts

back to the employee to proffer evidence to "create a genuine issue of material fact whether [the]

proffered explanation is merely pretext for unlawful" discrimination.  Id.  "The ultimate question

of proof—the burden of which remains on the employee throughout the inquiry—is whether the

employer's conduct was motivated by" the employee's request of his FMLA rights.  Id.

Eason has not presented direct evidence of discrimination.  Thus, the McDonnell Douglas

framework controls.

### a.  Walgreens has articulated a sufficient non-discriminatory reason to justify Eason's termination

Assuming that Eason can establish a prima facie case of discrimination, Walgreens has

articulated a non-discriminatory reason to justify Eason's termination:  Eason was dishonest

about his July 23, 2012 work absence.  As Walgreens argues, its burden to demonstrate a non-

discriminatory reason is "not onerous, nor does the explanation need to be demonstrated by a

preponderance of the evidence."  Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 975 (8th Cir. 2006).

Walgreens supports its non-discriminatory reason through its detailed investigation into Eason's

July 23 absence and its Constructive Discharge Policy, which provides that "Dishonesty" falls

under the "Serious Misconduct" category of offenses, and that "certain serious misconduct may

justify an employee's immediate dismissal after an appropriate investigation." Leland Decl. Ex. 35.

### b. Eason has failed to carry his burden in establishing Walgreens' proffered non-discriminatory reason is pretextual

To sufficiently demonstrate Walgreens' proffered non-discriminatory justification is pretextual, Eason must demonstrate Walgreens' conduct was motivated by retaliatory intent. Burciaga v. Ravago Ams., LLC 56 F. Supp. 3d 987, 1002 (S.D. Iowa 2014) (citing Casey's Gen. Stores, 638 F.3d at 999). In reviewing an employer's proffered reason, the Eighth Circuit has cautioned that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." Wilking v. Cnty. of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (quoting Harvey v. Anheuser-Busch, Inc. 38 F.3d 968, 973 (8th Cir. 1994) (quotations omitted)).

Eason presents a number of arguments in an effort to create a triable issue suggesting pretext.

### i. Inconsistent and Contradictory Testimony

Eason first argues that Walgreens' justification for Eason's termination is inconsistent and contradictory. Eason contends decision makers Walser, Varno, and Santowski gave conflicting testimony on issues including Walgreens' constructive discharge policy, whether Eason's absences were considered as part of his file review, and Varno's knowledge of Eason's FMLA status. Eason argues that the inconsistencies are evidence that "the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). However, this line of reasoning requires Walgreens' allegedly

inconsistent and contradictory statements to be directed at a material fact. Id. The somewhat conflicting answers provided by Walser, Varno, and Santowski do not address whether Eason's FMLA protected absences factored into his termination. Neither do they impeach the consistency of Walgreens' non-discriminatory justification. Thus, the inconsistent testimony highlighted by Eason does not raise a triable issue as to pretext.

Santowski's personal belief that Eason should have been suspended rather than terminated also fails to allege a fact issue for trial. While Santowski was the human resources employee assigned to this situation, the decision to terminate Eason was made by Varno. Santowski's recommendation of different discipline is irrelevant evidence of pretext.

### ii. Prior Absences

Eason argues that his attendance became an issue in 2012 only after he disclosed that the reasons behind his absences were the product of a long-term mental health diagnosis. Eason further contends that during the two-and-a-half weeks prior to his suspension, he reported FMLA absences for nearly half the time. Thus, Eason concludes, the requested documentation from his vet was designed to provide an acceptable alternative reason to terminate Eason's employment, when the real reason was that Eason's FMLA absences were the problem.

Eason's argument fails to recognize that his attendance record was an issue prior to disclosing his mental health issues were long-term rather than situational. Significantly, at the February 3, 2012 meeting called to discuss Eason's attendance issues, it was Walser who suggested Eason apply for FMLA leave. Eason also fails to acknowledge that his attendance issues persisted after the February 3 meeting, and even after he submitted his initial, later determined to be incomplete, FMLA paperwork. Indeed, Walgreens notes seven instances where

Eason was absent or late to work between February 29, 2012 and May 1, 2012 that were unrelated to any mental health issues, such as being blocked in by a snowstorm, taking his daughters to school to make sure a project arrived safely, and bringing his daughter to the doctor because she fell rollerblading. Finally, Eason's argument improperly assigns his termination to taking FMLA protected leave. The record, however, strongly supports that Walgreens' non-discriminatory justification for terminating Eason was because of his perceived dishonesty, not his FMLA leave. While Eason suggests that Walser's request for documentation was contrived as a method for lawfully terminating him, it is undisputed that Eason was unable to satisfy Walser's request and Walser believed Eason was being dishonest. Walser's request for Eason to substantiate his trip to the vet, regardless of its close temporal proximity that it occurred close in time to the FMLA protected absences, is not evidence of pretext.

### iii. File Review

Eason next argues that Walser and Varno's discussions about his attendance during his file review necessarily implicated the FMLA because the stated reason for termination—dishonesty—was unrelated to any attendance concerns. However, discussing Eason's attendance record during his file review does not, in and of itself, demonstrate pretext. Notably absent from the record is any evidence that Eason's FMLA absences were a concern to Walgreens. Also telling is that there is no inconsistency on Walgreens' position that Eason's employment was terminated because it believed Eason was being dishonest about a request for non-FMLA leave. That Walgreens reviewed his full attendance history after learning that he had fabricated an excuse for a non-FMLA leave day demonstrates a thorough review of Eason's employment

history, not that Walgreens was engaging in discriminatory conduct.  Dickinson v. St. Cloud Hosp., No. 7-3346, 2008 WL 4659562, at *8 (D. Minn. Oct. 20, 2008).

### iv.  Sham Investigation

Eason next attacks the motive of Walgreens' purported investigation into his absence on July 23, 2012, arguing that it was merely a sham to create a paper record against his FMLA claim.[5]

Eason concludes that the investigation was a sham because Walser was requesting documentation that he knew did not exist.  Eason's account of the record is incorrect.  At 7:59 a.m. on July 23, 2012, Eason emailed Walser, Reeve, and another Walgreens employee that he was taking his dog into the vet.  Conway Aff. Ex. N.  A few hours later that morning, at 11:29 a.m., Eason sent the following email to Walser:

> I just got back from the vet and they could not figure out what is wrong with her. [T]hey suggested someone stay with her and keep an eye on her, but I do not have anyone that can do that (my girls are in Missouri with my parents still). [W]ould it be possible to make this day up working the equivalent hours over the weekend - I can't afford to miss another day[?]

Id. Ex. P.  Walser responds at 1:38 p.m.:

> Just catching up on emails.  I've been out on the floor.  Sorry to hear about problems with the pooch.  I can't offer you the "make-up" option.  We just have

---

[5] Eason also claims that Walgreens' failure to provide Eason with FMLA eligibility notice within five business days after making his July 25, 2012 FMLA request further supports his conclusion that the termination had already been decided and the investigation was a cover up.  Eason cites Fjellestad v. Pizza Hut of Am., Inc., in support.  188 F.3d 944, 952 (8th Cir. 1999).  In Fjellestad, the plaintiff submitted three requests for reasonable accommodation that were never addressed by the employer.  Id. at 947–48.  The Eighth Circuit held "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith."  Id. at 952.  Here, unlike in Fjellestad, it was Walgreens that had previously engaged Eason in an interactive FMLA process.  Moreover, Walgreens originally suggested that Eason should consider applying for FMLA leave.  Thus, Fjellestad is distinguishable.

too many irons in the fire that require you to have personal interaction with the
team.
Please bring in documentation tomorrow to substantiate today's absence.  Hope
your pooch is feeling better.  Talk to you tomorrow.

Id. Ex. Q.  As the email chain shows, Walser requested Eason provide documentation the same

day Eason had claimed to be at the vet's office.  While Eason later told Walser he was unable to

satisfy the request because he did not actually visit the vet, this was unknown to Walser on July

23.  Eason first communicated that he did not actually see the vet in their July 25, 2012 meeting.

Walgreens continued to ask Eason about the events on July 23, and continued to receive

suspicious answers.  Finally, rather than resting on their belief that Eason's story was false,

Walser, Santowski, and Reeve phoned the vet's office, who reported their notes showed Eason

stopped in on July 25, 2012 seeking documentation for a visit.  The vet's office, however, did not

have a record of Eason visiting on July 23, 2012.  When asked if they routinely document the

type of visit Eason described, the vet's office responded "any time a customer talks with them

about their pet they typically put a note in the file for that pet."  Id. Ex. V.  The inescapable

conclusion is that Walgreens' investigation into Eason's July 23, 2012 absence was not

motivated as a cover-up for FMLA leave discrimination.

As evidence of discriminatory animus, Eason cites the two single word replies of

"perfect" and "nice" Varno wrote to Walser in response to his forwarding of emails to Eason.

While Eason characterizes Varno's explanation that he wrote the single word responses because

they were "specific," "short," "caring," and "didn't ramble and w[ere] short and to the point" as

incredulous and unbelievable, this is simply not a sufficient dispute to defeat summary judgment.

See Matthews v. Trilogy Commc'ns, Inc., 143 F.3d 1160, 1165 (8th Cir. 1998) (noting that the

plaintiff "must do more than simply create a factual dispute as to the issue of pretext; he must

offer sufficient evidence for a reasonable trier of fact to infer discrimination.").  No reasonable juror could conclude that Varno's one word responses is evidence of pretext for engaging in discrimination.

### v. Inconsistent Application of Corporate Procedures

Eason finally argues that Walgreens' treatment of a different employee underscores Eason's claim that his termination was the result of his FMLA absences and not dishonesty. Evidence that a similarly situated employee was treated differently may evince pretext.  <u>Norman v. Union Pac. R.R. Co.</u>, 606 F.3d 455, 461 (8th Cir. 2010).  The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  <u>Casey's Gen. Stores</u>, 638 F.3d at 994 (quoting <u>Cherry v. Ritenour Sch. Dist.</u>, 361 F.3d 474, 479 (8th Cir. 2004)).  "Although the standard for determining whether employees are similarly situated is rigorous at the pretext stage, we do not require the plaintiff to produce evidence of a clone." <u>Burton v. Ark. Sec'y of State</u>, 737 F.3d 1219, 1230–31 (8th Cir. 2013) (citation and quotation marks omitted).

Eason submits that a function manager was not terminated despite egregious and dishonest conduct.  This individual twice denied engaging in certain conduct, only to have his denial exposed by other employees.  Eason alleges that Walgreens formally recognized this person's dishonesty by issuing written discipline.  The individual, however, was not terminated. Eason additionally alleges the individual was not terminated despite ramming another employee with a lift truck after an angry confrontation.

The individual identified in Eason's briefing is not similarly situation to Eason and thus does not provide evidence of pretext. Eason and the individual held different jobs with different supervisors. Eason, as a supervisory employee, had a higher position than the individual. Since it is reasonable to expect that employees with more authority and responsibility will be held to a higher standard of conduct, the individual is not similarly situated to Eason. See Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 917 (6th Cir. 2013) ("Moreover, Ms. Martinez's role as a manager at Cracker Barrel could reasonably justify holding her to a more stringent standard of conduct than that applied to Ms. Guidry, who holds the position of assistant manager."). Moreover, Eason's dishonest conduct is markedly different than the dishonest conduct the other individual allegedly committed. The identified individual claimed he never raised his middle finger at a subordinate, where Eason claimed he needed a day off from work to take his dog to the vet when he did not actually see the vet.[6] Thus, the other Walgreens employee identified by Eason does not buttress his pretext argument.

Because Eason cannot muster sufficient evidence to raise a material question of fact as to pretext, his FMLA discrimination claim fails.

## C. Remaining Claims

### 1. MHRA Reprisal

Eason also contends Walgreens' conduct violated the MHRA's prohibition against reprisal. "It is an unfair discriminatory practice to engage in reprisal against any person because that person opposed a practice prohibited by the MHRA." Ewald v. Royal Norwegian Embassy,

---

[6] The critical inquiry here is not whether Eason actually did not go to the vet's office, but whether Walgreens in good faith believed that Eason was lying about having done so. See Pulczinski, 691 F.3d at 1002 (discussing the "honest belief rule").

902 F. Supp. 2d 1208 (D. Minn. 2012) (citing Minn. Stat. § 363A.15).  Under the statute, a

reprisal is defined as "any form of intimidation, retaliation, or harassment."  Minn. Stat. §

363A.15.  To establish a prima facie case, Eason must establish that he engaged in statutorily

protected conduct, suffered an adverse employment action, and that a causal connection exists

between the two.  Hoover v. Nw. Private Mortg. Banking, 632 N.W.2d 534, 549 (Minn. 2001).

Here, even if Eason did state a prima facie case for reprisal, these claims are analyzed

under the McDonnell Douglas burden shifting test.  Fletcher v. St. Paul Pioneer Press, 589

N.W.2d 96, 101 (Minn. 1999).  As previously concluded, Eason failed to provide sufficient

evidence that Walgreens' stated non-discriminatory justification was pretextual.  Accordingly,

Walgrees is entitled to summary judgment on this claim.

### 2.  ADA Retaliation

Eason next avers Walgreens violated the ADA when it retaliated against him for

requesting additional FMLA leave in his July 25, 2012 meeting with Walser.  The ADA

prohibits employers from discriminating against any individual because that individual "has

opposed any act or practice made unlawful by this chapter or because such individual made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing."  42 U.S.C. § 12203(a).  Requesting an accommodation is a protected activity.

Kirkenberg v. Canadian Pac. R.R., 619 F.3d 898, 907–08 (8th Cir. 2010).  Successful claims

require a showing of direct evidence of retaliation or an inference of retaliation must be created

in accordance with the McDonnell Douglas burden-shifting framework.  E.E.O.C. v. Prod.

Fabricators, Inc., 763 F.3d 963, 972 (8th Cir. 2014).

"Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." Young-Losee v. Graphic Packaging Intern., Inc., 631 F.3d 909, 912 (8th Cir. 2011) (citing Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 57, 68 (2006)). "'Direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).

Eason has failed to present sufficient direct evidence of retaliation to create a triable question of fact. That Walser never communicated the possibility of suspension to Eason or his fellow supervisors, is circumstantial, rather than direct, evidence. Griffith, 387 F.3d at 736. Eason's sole basis of direct evidence of retaliation is the temporal proximity between the protected activity and the adverse employment action. Standing alone, temporal proximity is generally insufficient to satisfy a showing of direct evidence. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). For example, in Young-Losee, temporal proximity served as direct evidence of retaliation where the complainant's supervisor, after receiving a formal complaint of harassment, "wadded up her complaint, called it 'total bullshit,' threw it in the garbage can, told her to leave, and said he never wanted to see her again." 631 F.3d at 912. The facts here are markedly different. The actions of the supervisor in Young-Losse clearly communicated discriminatory animus because they were egregious and were directly related to receiving the complaint of harassment. Here, Eason alleges Walser had a change in emotions during the meeting. A general allegation of becoming upset is a very different reaction than the supervisor's response in Young-Losee. Additionally, a reasonable juror could also conclude that

Walser became upset because Eason was not addressing the issue, whether Eason could provide documentation for his visit to the vet.

### 3. ADA and MHRA Discrimination

Finally, in addition to asserting a FMLA discrimination claim, Eason also avers discrimination claims arising under the ADA and MHRA. Both claims are analyzed under the McDonnell Douglas burden-shifting framework, the same rigor that was applied to Eason's FMLA discrimination claim. See Wilking, 153 F.3d at 872 ("The MHRA parallels the ADA, and MHRA claims are also analyzed using the McDonnell Douglas burden-shifting scheme."). For the reasons articulated above, Eason cannot show Walgreens' proffered non-discriminatory reasons were pretextual, and thus the ADA and MHRA discrimination claims fail.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant's Motion for Summary Judgment [Docket No. 37] is **GRANTED**; and

2.    All claims in the Complaint [Docket No. 1-1] are **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: July 15, 2015.